UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARGARET LU EGINTON,

       Plaintiff,

 v.                       Case No. 8:13-cv-1893-T-33AEP

FLORIDA STATE UNIVERSITY,

       Defendant.

_____/

**ORDER**

This cause comes before the Court pursuant to Defendant Florida State University's (FSU) Motion for Summary Judgment (Doc. # 40), which was filed on February 9, 2015. Plaintiff Margaret Lu Eginton filed her response in opposition to the Motion on March 11, 2015. (Doc. # 53). Thereafter, FSU filed its reply on March 30, 2015. (Doc. # 58).  In addition, at the direction of the Court, the parties filed supplemental briefs on the issue of retaliation on May 20, 2015. (Doc. ## 64-67). For the reasons that follow, the Court grants FSU's Motion.

## I.   Background

The FSU/Asolo Conservatory for Actor Training in Sarasota, Florida, is a three year graduate program, culminating in a Master of Fine Arts degree conferred by FSU.

(Doc. # 40 at 3; Doc. # 44 at 2; Doc. # 45 at 105). The Conservatory has a small staff of non-tenure track faculty, which includes a program director, two acting teachers, one voice teacher, and one movement teacher. (Doc. # 44 at 32-34; Doc. # 45 at 31). Twelve students are selected each year to attend the Conservatory. (Doc. # 44 at 55; Doc. # 49 at 2).

Eginton is an experienced "teacher, director, and performer with extensive international experience in both theater and dance." (Doc. # 1 at ¶¶ 12-13). On April 2, 2002, Eginton negotiated the terms of her employment contract with "Florida State University Dean Nancy Smith Fichter and then-Director of the [Conservatory] Gil Lazier." (Doc. # 53-4 at ¶ 3). The terms of her contract included "directing a play each year, traveling to London with students each year, performing tutorials, and having full control of [her] curriculum." (Id. at ¶ 4).

However, Eginton's offer letter – dated April 2, 2002 – does not reflect those responsibilities. (Doc. # 41-4). Indeed, Eginton characterized her opportunity to direct as a "handshake agreement with Gil Lazier." (Doc. # 41-3 at 32). Rather, the letter indicates that FSU hired Eginton to serve as an "Assistant in Actor Training, with a courtesy

2

appointment as an Associate Professor in the School of Theatre." (<u>Id.</u>). The offer letter explained that Eginton's "duties at [FSU] will include responsibility for teaching movement classes at the [Conservatory] in Sarasota, Florida, and such other research or creative activity and service as may be assigned." (<u>Id.</u>). On August 8, 2002, Eginton began her employment with FSU. (Doc. # 1 at ¶ 14).

Gregory Leaming – the focus of Eginton's Complaint – joined the Conservatory as Director in 2004. (Doc. # 44 at 9). Soon thereafter, in 2005, Leaming gave Eginton the opportunity to direct a play during the upcoming theatrical season; however, three weeks before rehearsals were to begin, Eginton withdrew from the production. (Doc. # 41 at 36-38; Doc. # 44 at 86-87). Following the 2006 season, Leaming developed a "practice for assigning directorial slots for the Conservatory's four-play season." (Doc. # 40 at 5; Doc. # 44 at 92; Doc. # 50). Specifically, Leaming kept one slot for himself, assigned two slots to the two acting teachers, and assigned the fourth slot to "different 'up-and-coming' guest directors . . . to help develop[] a professional network between the Conservatory students and the outside theatrical world." (Doc. # 40 at 5; Doc. # 44-1 at 128; Doc. # 50).

3

Aside from Leaming joining the faculty, the Conservatory's composition further evolved. FSU submits that this change of hands led to confusion regarding Eginton's actual position title (due to her "courtesy title") and, in turn, her eligibility for a promotion. (Doc. # 40 at 11; Doc. # 43-1 at 27-28). The delay in her promotion is one of many issues Eginton enumerates regarding her time at the Conservatory. Eginton also claims she was "subjected to unwarranted denial of opportunities for creative and scholarly opportunities" (Doc. # 1 at ¶ 19), "subjected to curriculum micro-managing" (Id. at ¶ 20), and "subjected to unwarranted criticism and disparagement of her work and her character." (Id. at ¶ 21). "Due to the discriminatory treatment she was subjected to, Eginton's health began to diminish." (Doc. # 53 at 14).

In particular, Eginton alleges that Leaming "often implied that Eginton was loose or promiscuous and emotionally unstable." (Doc. # 53 at 6). "As an example, during a faculty meeting filled with [Eginton's] peers, Leaming scoffed that Eginton should 'hook up' with a prospective male teaching candidate." (Id.; Doc. # 41 at 76). Leaming similarly told Eginton that she looked "sexy" while she was dressed in a unitard. (Doc. # 41 at 75). On April 24, 2005, Leaming threw

4

all of Eginton's personal belongings on her office floor and "refused to give [Eginton] a desk." (Doc. # 53-4 at ¶ 6). Eginton was frequently told not to speak at meetings (Doc. # 41 at 68-69), and provides that Leaming did not exhibit the same "hostility" toward men:

> I never heard [Leaming] shout or scream at a male faculty member in public or in faculty meetings. He never made unwelcome comments regarding a male faculty member's private life or body shape. He did not stop a male faculty member's end of year exam, or non-verbally behave in a rude and dismissive manner in front of students and donors.

(Doc. # 53-4 at ¶ 42).

In addition to his comments about Eginton, Leaming also called a female donor a "fat cow" (Doc. # 46 at 49; Doc. # 54-7); instructed a number of female students to lose weight (Doc. # 46 at 29; Doc. # 41 at 111; Doc. # 53-1 at 1); and admitted more men into the Conservatory than women. (Doc. # 44 at 56). Leigh Anne West, a former Conservatory student, reported hearing Leaming refer to Eginton as a "crazy bitch" in front of students and "verbally belittle [Eginton's] professional abilities in front of students." (Doc. # 53-2 at 2).

Debi Schlach, Leaming's former assistant, described Leaming as "demeaning, demoralizing, rude, and nasty." (Doc. # 46 at 18). Schlach stated that Leaming raised his voice

5

"almost daily" when addressing her. (Id. at 36). Karen Patriarca, the former Student Services Director, also testified that Leaming was dismissive and had once slammed the door in her face. (Doc. # 53-3 at 2-3). Schlach reports that Leaming called Patriarca a "dyke" and explained to others that Patriarca is "completely unfeminine." (Doc. # 46 at 34-35).

Sally McRorie, Dean of FSU's College of Visual Arts Theater and Dance at the relevant time period, admitted that Leaming could be "emotionally volatile and brusque in his actions with others" and described Leaming as "dismissive to faculty and staff of both genders." (Doc. # 45 at 36-37). Charles Cameron Jackson, Executive Director of the School of Theater, also indicated that Leaming was "abrupt, explosive, and degrading to the employees." (Doc. # 54-5 at 2). Jackson submitted that "[t]here have been regular reports of shouting, expletives, and a couple stories of the throwing of objects when angered." (Id.).

Other members of the Conservatory have described Leaming as having a "direct communication style" and "artistic temperament." (Doc. # 47 at 2). Leaming himself agrees that he can be loud when dealing with employees, and that his manner of dealing with people can be "mistaken as being

6

aggressive" and "dismissive of them and their views." (Doc. # 44 at 30-32). Leaming stated that people "are scared when they stand next to [him]," noting his height – he is 6'6. (Id. at 105).

Although Eginton requested administrative action as early as 2008 due to Leaming's conduct (Doc. # 43-4), Eginton sent a 49-page letter to Director Jackson in order to "lodge a formal complaint" on May 23, 2011. (Doc. # 40 at 13; Doc. # 41-3). Thereafter, on June 8, 2011, Eginton sent an email to Jackson and McRorie requesting that the May 23, 2011, letter be treated as a formal complaint. (Doc. # 44-1 at 50-51). Eginton claims that, as retaliation for her May 23, 2011, letter and subsequent complaints, she was "ostracized from the small community that made up the Conservatory, and she continued to be treated in a hostile way in her daily interactions" with Leaming. (Doc. # 65 at 7). Eginton also submits that Leaming retaliated against her by reassigning a quarter of her curriculum to a new male hire named Brendon Fox. (Doc. # 53 at 25-26 n.168).

"When the University failed to properly take action," Eginton filed a complaint with the Equal Employment Opportunity Commission (EEOC) on August 16, 2011. (Doc. # 53 at 13). Eginton took a "professional development leave" for

7

the 2012-2013 academic year. (Doc. # 41 at 191-92; Doc. # 44 at 144; Doc. # 45 at 93). On April 23, 2013, the EEOC issued a right-to-sue letter. (Doc. # 56-8). Thereafter, on May 8, 2013, Eginton formally resigned. (Doc. # 57-1).

Eginton initiated this action on July 23, 2013, alleging three violations of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e, et seq: Sex Discrimination (Count I), Hostile Work Environment (Count II), and Retaliation (Count III). (See Doc. # 1). FSU filed the present Motion on February 9, 2015, which is ripe for the Court's review. (Doc. # 40).

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742

8

(11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a

genuine issue of material fact, the court should not grant summary judgment. _Samples ex rel. Samples v. City of Atlanta_, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing _Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau_, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. _Morris v. Ross_, 663 F.2d 1032, 1034 (11th Cir. 1981), _cert. denied_, 456 U.S. 1010 (1982).

## III. **Analysis**

### A. **Discrimination**

"In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence, or statistical evidence." _Standard v. A.B.E.L. Servs., Inc._, 161 F.3d 1318, 1330 (11th Cir. 1998). Eginton expressly bases her claim on circumstantial evidence of sex discrimination. (Doc. # 53 at 18).

In analyzing allegations supported by circumstantial evidence under Title VII, as in the present case, the Court follows the burden-shifting analysis established in _McDonnell Douglas Corp. v. Green_, 411 U.S. 792 (1973), and its progeny. _Harper v. Blockbuster Entm't Corp._, 139 F.3d 1385, 1387 (11th

Cir. 1998).  Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03.  Once the plaintiff has established a prima facie case, the burden of proof shifts to the defendant.  Id.

To rebut the presumption of discrimination created by a plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  However, "[t]his is a burden of production, not persuasion." Standard, 161 F.3d at 1331.  A defendant "must merely produce evidence that could allow a rational fact finder to conclude" its actions were not motivated by discriminatory animus.  Id.

If the defendant produces such evidence, the burden shifts again to the plaintiff.  McDonnell Douglas, 411 U.S. at 802-03.  The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [her] prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the

adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

"To make out a prima facie case of [sex] discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). FSU takes issue only with whether Eginton can establish that she suffered an adverse employment action. (Doc. # 40 at 19). Therefore, the Court deems the remaining factors admitted. With respect to the adverse employment action, Eginton contends that FSU delayed her promotion and that she was constructively discharged from her employment with FSU. (Doc. # 53 at 6-9, 18-20). The Court will address each contention in turn.

### 1.   Delay of Promotion

FSU concedes that Eginton's promotion was delayed. (Doc. # 40 at 20). Eginton provides that the promotion would have provided "a six percent raise and additional benefits" (Doc. # 53 at 6), and FSU does not dispute this point. (See Doc. # 58). Accordingly, the Court finds that the delay in Eginton's promotion qualifies as an adverse employment action, because

it constitutes a "*serious and material* change in the terms, conditions, or privileges of employment." <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). Therefore, as FSU has admitted the remainder of the requisite elements, Eginton has set forth a prima facie case of discrimination based on the delay in her promotion.

Because Eginton has met her burden of establishing a prima facie case, the burden shifts to FSU to provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff. <u>Burdine</u>, 450 U.S. 248, 254 (1981). FSU responds that the delay in Eginton's promotion "was the consequence of the confusion regarding her actual title." (Doc. # 40 at 21). Specifically, as described above, Eginton was hired at the rank of "assistant in" but permitted to use the courtesy title of "associate in." (Doc. # 41-4). Eginton submits that, "[a]s an 'Assistant in' [Theatre], she would have been eligible for promotion after three years" (Doc. # 53 at 6), whereas individuals at a rank of "associate in" are eligible for promotion after ten years of service. (Doc. # 43-1 at 26).

FSU submits that Eginton's "courtesy appointment" caused "widespread confusion among the Committee, [Eginton], and the

School of Theatre administrators, all of whom believed [Eginton] was actually an 'associate' and therefore would not be eligible for promotion until she completed ten years of service." (Doc. # 40 at 11; Doc. # 43-1 at 27-28). However, "the courtesy title didn't confer that status." (Doc. # 43-1 at 27). This confusion was compounded by a number of personnel changes that occurred shortly after Eginton's hire. (Doc. # 40 at 11 n.15; Doc. # 43-12; Doc. # 45-13). Jackson explained:

> The assignment of responsibility, AOR, from the time I arrived, said associate. And I took that to mean that she was an associate in.
>
> Her contract . . . did, when we tracked it back, say Assistant In. And her original hire paperwork, which seemed to fall under three different people: Nancy Smith-Victor, who is the interim person, and then Steve Wallace, and now we are under Sally McRorie, all of these different people had sort of different indications on it to me, but that she was hired as Assistant In but was given this title of Associate Professor.
>
> So there was confusion about exactly where [Eginton] was in rank to me. And when it was first brought up, "Oh, I thought it was this." I think it was [Eginton], but I don't know who said it first, "Well, but it says right here on your AOR, it says associate." So that would mean that it's 10 years, and that would be from this date to this date.
>
> When it got pressed further, we did a lot more sort of piecing together everything and realized that, in fact, it was Assistant In, and then sought about to try to get her through the promotion process.

(Doc. # 43-1 at 27-28). Thereafter, Jackson told Eginton that she could submit her materials to the Committee for consideration at its next meeting; however, in an email dated January 9, 2010, Eginton "chose to wait [until] the next cycle" to go up for a promotion (Doc. # 43-1 at 31; see Doc. # 43-15), noting the time needed to prepare the necessary materials. (Doc. # 53-4 at ¶ 20; Doc. # 43-15).

FSU's proffered reasons for the delay are legitimate and nondiscriminatory, and have not been shown to be pretextual. See Blue v. Dunn Const. Co., Inc., 453 F. App'x 881 (11th Cir. 2011). Indeed, "[a] reason cannot . . . be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Id. at 884. Accordingly, Eginton's discrimination claim fails to the extent that it relies on the delay of her promotion.

### 2.   Constructive Discharge

As a second basis for her discrimination claim, Eginton contends that she was constructively discharged from her employment with FSU. (Doc. # 53 at 9, 18-20). To establish constructive discharge, a plaintiff must show that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." Menzie v. Ann Taylor Retail Inc., 549 F. App'x 891, 894-95 (11th Cir.

2013) (quoting Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997)). The Eleventh Circuit has noted that "this objective standard sets a high threshold; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment." Id. The threshold "is quite high." Beltrami v. Special Counsel, Inc., 170 F. App'x 61, 62-63 (11th Cir. 2006) (collecting constructive discharge cases).

Eginton submits that "[o]n April 24, 2005, [Leaming] took my belongings from the Director's office and threw them on the floor. He also refused to give me a desk." (Doc. # 53-4 at ¶ 6). Eginton further alleges that "[f]rom 2004 to 2013, Eginton piecemeal lost control over her curriculum and academic responsibilities." (Doc. # 53 at 8). In particular, Eginton contends that Leaming limited her coaching opportunities upon his arrival at the Conservatory (Doc. # 41 at 96); "inserted male instructors into her curriculum without her knowledge and consent" (Doc. # 53 at 8; Doc. # 41 at 173); cut her choreography from a number of plays (Doc. # 41 at 101-04); interrupted her class without warning (Doc. # 53-4 at ¶ 27); and on at least two occasions, "used threatening physical gestures" and shouted at her repeatedly

16

during a faculty meeting. (Id. at ¶¶ 32-33). Finally, Eginton
states that she was denied directing opportunities (Doc. # 53
at 8-9; see Doc. # 44 at 83), and the opportunity to travel
to London with the Conservatory students, "though it was a
condition of her employment." (Doc. # 53 at 9).

The Court finds that Eginton's allegations do not meet
the high threshold of constructive discharge. To begin, the
terms regarding directing opportunities and the trip to
London were not included in the written offer letter presently
before the Court. (Doc. # 41-4). Indeed, Eginton
characterized her opportunity to direct as a "handshake
agreement with Gil Lazier," who was the Director at the time
Eginton was hired but no longer at the Conservatory when
Leaming arrived. (Doc. # 41-3 at 32). During her deposition,
Eginton was asked whether she received any other document
relating to her duties. (Doc. # 41 at 22). Eginton responded:

> I received a letter from Dean Lynn Hogan after I
> questioned – I wanted it in writing that I would
> direct every year and go to London every year, which
> is what Gil Lazier promised me, and Lynn's response
> was that London was in rotation and that, yes, I
> would direct every year, because that was at the
> discretion of Gil Lazier and that was our
> understanding. . . . "Discretion" is not actually
> the word that was used. It was, "The season is
> decided by the faculty and the director," I
> believe. That's what I remember.

(Id. at 22-23).

17

Eginton has not supplied that letter and it is not currently before the Court. Eginton's description of her conversation with Dean Hogan supports FSU's position. First, consistent with Eginton's statements, FSU explains that the faculty member who accompanies the students on the trip to London is based on a rotation, which includes females. (Doc. # 44 at 244). The Court further notes that Eginton went to London during the summers of 2003 and 2010. (Doc. # 44 at 244; Doc. # 41-3 at 24-25, 47).

Second, Gil Lazier was able to promise Eginton the opportunity to direct, because Lazier – as Director of the Conservatory at the time Eginton was hired – was responsible for assigning directorial opportunities. (Doc. # 41 at 22-23). However, as set forth above, Leaming joined the Conservatory as Director in 2004. (Doc. # 44 at 9). Soon thereafter, in 2005, Leaming gave Eginton the opportunity to direct a play during the upcoming theatrical season; however, three weeks before rehearsals were to begin, Eginton withdrew from the production. (Doc. # 41 at 36-38; Doc. # 44 at 86-87).

Following the 2006 season, Leaming developed a "practice for assigning directorial slots for the Conservatory's four-play season." (Doc. # 40 at 5; Doc. # 44 at 92; Doc. # 50).

18

Specifically, Leaming kept one slot for himself, assigned two slots to the two acting teachers, and assigned the fourth slot to "different 'up-and-coming' guest directors . . . to help develop[] a professional network between the Conservatory students and the outside theatrical world." (Doc. # 40 at 5; Doc. # 44-1 at 128; Doc. # 50). FSU also notes that Leaming and the two acting teachers are required to direct under their employment contracts, whereas Eginton's contract contains no such requirement. (Doc. # 41-3 at 32; Doc. # 41-4).

Furthermore, the Court is reluctant to otherwise second-guess FSU's decisions regarding Eginton's responsibilities, as "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on disagreement with the employer's reassignment of job tasks." Byrne v. Ala. Alcoholic Bev. Control Bd., 635 F. Supp. 2d 1281, 1292-93 (M.D. Ala. 2009). Such claims "strike at the very heart of an employer's business judgment and expertise, and, in particular, with regard to public entities, their responsibility of balanc[ing] limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public." Id.

Upon review of the record, the Court finds that Eginton has failed to demonstrate that these "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." Menzie, 549 F. App'x at 894-95. Accordingly, Eginton has not demonstrated that she was constructively discharged and, thus, her prima facie case of discrimination fails.

Having determined that Eginton's discrimination claim is unsuccessful upon consideration of (1) the delay in her promotion and (2) her alleged constructive discharge, the Court grants FSU's Motion as to Count I, for sex discrimination.

**B.    Hostile Work Environment**

To prove a prima facie case of hostile work environment, Eginton must establish that: (1) she belongs to a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment, and (5) a basis exists for holding FSU liable. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000) (citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), cert. denied, 531 U.S. 1076

(2001)). FSU takes issue only with whether Eginton can establish that the conduct was based on her sex and whether the conduct was severe or pervasive. (Doc. # 40 at 15-17). Therefore, the Court deems the remaining elements admitted.

To begin, the Court considers whether Eginton offers sufficient evidence to support her contention that the alleged discriminatory treatment was related to a protected characteristic. Title VII only "prohibits discrimination, including harassment that discriminates based on a protected category such as sex." Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir. 2007).

Eginton alleges that, "during a faculty meeting filled with [Eginton's] peers, Leaming scoffed that Eginton should 'hook up' with a prospective male teaching candidate" (Doc. # 53 at 6; Doc. # 41 at 76); and, on other occasions, remarked that Eginton looked "sexy" while she was wearing a unitard (Doc. # 41 at 75). Taking these allegations as true, the Court does not find these comments gender-related.

The Court considers other evidence in the record, which suggests that Leaming called Eginton a "crazy bitch." (Doc. # 53-2 at 2). The Eleventh Circuit has held that "[c]alling a female colleague a 'bitch' is firmly rooted in gender. It is humiliating and degrading based on sex." Reeves v. C.H.

Robinson Worldwide, Inc., 594 F.3d 798, 810 (11th Cir. 2010).

The Court also takes note of Schlach's statements that Leaming

called Patriarca a "dyke" and explained to others that

Patriarca is "completely unfeminine" (Doc. # 46 at 34-35), as

well as the allegation that Leaming called a female donor a

"fat cow" (Doc. # 46 at 49; Doc. # 54-7).

Although the Court finds the use of pejorative terms

offensive, even assuming that all of Leaming's actions were

related to a protected characteristic, they do not rise to

the level required by Mendoza and its progeny. Whether the

conduct complained of was "sufficiently severe or pervasive

to alter the conditions of employment and create an abusive

working environment," is crucial in determining whether a

plaintiff has proven a hostile work environment claim. Gupta,

212 F.3d at 583. A hostile work environment exists only where

the work environment is "permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." Harris

v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal

citations omitted). Even if the plaintiff is able to prove

one factor in the prima facie case, this "does not compensate

for the absence of the other factors." <u>Mendoza</u>, 195 F.3d at 1248.

To establish the threshold of severity or pervasiveness, both an objective and subjective component must be present. <u>Mendoza</u>, 195 F.3d at 1246. In assessing the objective component, four factors should be considered: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. <u>Id.</u>

Conduct far more severe or pervasive than what Eginton has alleged has failed to meet the high threshold of proof in the Eleventh Circuit. <u>See</u> <u>e.g.</u>, <u>Mendoza</u>, 195 F.3d at 1247-49 (holding that a supervisor's acts of rubbing his hip against the plaintiff's hip while touching her shoulder and smiling, looking at her groin area while making a sniffing sound, and "constantly" staring at her and following her, over an eleven month period, were insufficient as a matter of law to sustain a sexual harassment claim); <u>Lockett v. Choice Hotels Int'l, Inc.</u>, 315 F. App'x 862, 863-64 (11th Cir. 2009) (affirming summary judgment where the alleged harasser purportedly engaged in sexual banter, discussed oral sex with plaintiff,

touched plaintiff's buttocks, referred to plaintiff as a "ho" and "bitch," and "jumped in [plaintiff's] face and acted like he was going to hit [her]"); <u>Willets v. Interstate Hotels, LLC</u>, 204 F. Supp. 2d 1334, 1337 (M.D. Fla. 2002) (finding no actionable harassment where supervisor hugged plaintiff in a "sexualized manner," rubbed plaintiff's head and shoulders, frequently indicated love for plaintiff, grabbed plaintiff's buttocks, kissed plaintiff's neck, and placed a hand on plaintiff's inner thigh).

Upon consideration of the factors required to establish severe or pervasive conduct, Eginton's allegations of discrimination do not meet the <u>Mendoza</u> standard. 195 F.3d at 1245. Indeed, "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." <u>Reeves</u>, 594 F.3d at 807. Accordingly, Eginton has not established a prima facie case as to her hostile work environment claim and, in turn, FSU's Motion is granted as to Count II.

## C. <u>Retaliation</u>

Eginton also asserts that FSU subjected her to retaliation. "Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee

'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a)).

"A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). FSU concedes that Eginton engaged in protected activity, but contends that Eginton has not demonstrated an adverse employment action or causal connection. (Doc. # 40 at 24; see Doc. # 64). The Court addresses both factors in turn.

### 1.   Adverse Employment Action

Eginton contends that she was "ostracized from the small community that made up the Conservatory, and she continued to be treated in a hostile way in her daily interactions with Leaming." (Doc. # 65 at 7). Eginton also states that her

25

"curriculum and responsibilities were whittled away" in response to her complaints. (Doc. # 65 at 7). Specifically, Eginton provides that "[a]fter enduring years of Leaming's abuse, on May 23, 2011, Eginton sent a letter to Jackson, lodging a formal complaint against Leaming. Soon thereafter, a quarter of Eginton's second year teaching curriculum was assigned to a new male instructor (Brendon Fox)." (Doc. # 53 at 25-26 n.168; Doc. # 41-1 at 149-50).

Although record evidence supports Eginton's contention that her curriculum was reassigned, counsel's argument that Eginton was unable to fulfill her teaching requirements is not supported by the record. "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F. 3d 1321, 1326 (11th Cir. 2005). The Court thus considers only Eginton's reassigned curriculum.

Upon consideration of all of Eginton's contentions and accepting them as true, these allegations do not amount to conduct that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Instead, the Court finds that Eginton's contentions about her curriculum amount to "ordinary tribulations of the workplace

and petty slights," which do not constitute a materially adverse employment action. Byrd v. Auburn Univ. Montgomery, 268 F. App'x. 854, 856 (11th Cir. 2008). In fact, the Court notes that Eginton's syllabus from the 2011-2012 academic year indicates that she continued to teach the Restoration style to her students. (Doc. # 64-4). Thus, the Court finds that Eginton failed to demonstrate that she faced an adverse employment action.

## 2.   Causal Connection

Eginton's prima facie case of retaliation fails even assuming, arguendo, that her reassigned curriculum qualifies as an adverse employment action. Specifically, there is no causal connection between the reassigned curriculum and Eginton's complaints. To establish the causal connection, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated. Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks omitted). The Supreme Court has stated that temporal proximity between an employer's knowledge of protected activity and an adverse employment action may be sufficient evidence of a causal connection if the temporal proximity is "very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

Eginton submits that, in response to her complaints, Leaming reassigned a quarter of her curriculum to Fox, a new male hire. (Doc. # 53 at 25-26 n.168). Leaming interviewed Fox as a potential interim instructor in February of 2011; specifically, Fox would be teaching a course called Acting II during the 2011-2012 academic year. (Doc. # 61-1 at ¶ 7-8). As part of the interview process, Fox submitted a proposed syllabus that focused on the works of Shakespeare. (Id. at ¶ 8). Upon review of Fox's proposed syllabus, Leaming suggested that Fox "pursue a more varied curriculum which included teaching and other areas of his expertise" and noted that the former Acting II instructor assembled her syllabus in a similar manner. (Id.). In particular, Leaming "suggested that [Fox] incorporate the Restoration style and works by [George Bernard] Shaw into his proposed curriculum." (Id.). In April of 2011, Leaming again interviewed Fox and, after a "lengthy discussion," offered Fox the position. (Id.).

In May of 2011, Fox accepted the position and finalized his syllabus later that month. (Doc. # 64-5 at ¶ 4). As discussed, Eginton sent a letter to Jackson on May 23, 2011. Thereafter, on June 8, 2011, Eginton sent an email to Jackson and McRorie requesting that the letter be treated as a formal complaint. (Doc. # 44-1 at 50-51). Considering that the

28

progression of Fox's proposed syllabus occurred before Eginton's complaints, the Court finds that Eginton is unable to demonstrate a causal connection.

Indeed, Fox's hiring and syllabus development bears no relation – temporal or otherwise – to Eginton's complaints. As an initial matter, even assuming that Leaming assigned the curriculum to Fox as Eginton claims, there is no evidence in the record to demonstrate that Leaming was aware of Eginton's complaints at that time. Indeed, Leaming states that he was unaware of Eginton's complaints to McRorie and Jackson. (Doc. # 44 at 106-07). Regardless of whether Leaming knew of the complaints, Leaming provides that it "is common for the subject-matter of curriculum to overlap between teachers." (Doc. # 64-1 at ¶ 10). In other words, there is nothing to suggest that Fox's curriculum, including Restoration style, prevented Eginton from also teaching Restoration style courses. In fact, Eginton's syllabus from the 2011-2012 academic year indicates that she continued to teach the Restoration style to her students. (Doc. # 64-4).

Upon review of the record, the Court finds that Eginton is unable to set forth a prima facie case of retaliation. She asserts that a portion of her curriculum was assigned to another teacher, yet she continued to teach Restoration style

courses, and has not explained why Fox's overlapping courses constitute an adverse employment action.  In addition, there is no evidence to support that Leaming was aware of her complaints at the time he hired Fox and authorized Fox to teach Restoration style classes.  The Court accordingly determines that there is no causal connection between Eginton's complaints and Leaming's decisions regarding Eginton's curriculum.  Thus, FSU's Motion is granted as to Count III.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Florida State University's Motion for Summary Judgment (Doc. # 40) is **GRANTED.**

(2)   The Clerk is directed to enter judgment in favor of Defendant and, thereafter, **CLOSE THIS CASE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 26th day of May, 2015.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:  All Counsel of Record